Filed 6/16/21

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| NEWTOWN PRESERVATION SOCIETY et al., | C092069 |
| Plaintiffs and Appellants, | (Super. Ct. No. PC20190037) |
| v. | |
| COUNTY OF EL DORADO et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of El Dorado County, Dylan Sullivan, Judge. Affirmed.

Soluri Meserve, Patrick M. Soluri and Osha R. Meserve, for Plaintiffs and Appellants.

David A. Livingston, County Counsel, Breann M. Moebius, Deputy County Counsel, for Defendants and Respondents.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts II through IV of the Discussion.

1

This California Environmental Quality Act (Act) challenge concerns the adoption of a mitigated negative declaration for and approval of the Newtown Road Bridge at South Fork Weber Creek Replacement Project (the project) by respondents El Dorado County (County) and its board of supervisors (collectively respondents). The proposed project is the replacement of an existing bridge. Petitioners Newtown Preservation Society, an unincorporated association, and Wanda Nagel (collectively petitioners) challenged the mitigated negative declaration, arguing, among other things, the project may have significant impacts on fire evacuation routes during construction and, thus, the County was required to prepare an environmental impact report. The trial court upheld the mitigated negative declaration. Petitioners appeal.

Petitioners argue the trial court erred in upholding the mitigated negative declaration because: (1) substantial evidence supports a fair argument of potentially significant impacts on resident safety and emergency evacuation; (2) the County impermissibly deferred analysis of temporary emergency evacuation impacts; (3) the County impermissibly deferred mitigation of such impacts; and (4) the County deferred analysis of impacts pertaining to construction of a temporary evacuation route.

In the published portion of this opinion, we explain that petitioners' framing of the fair argument test in terms of the project having "potentially significant impacts on resident safety and emergency evacuation" is erroneous. The test is instead whether the record contains substantial evidence that the project may have a significant effect on the environment or may exacerbate existing environmental hazards. We conclude petitioners have failed to carry their burden of showing substantial evidence supports a fair argument of significant environmental impact in that regard.

In the unpublished portion of the opinion, we conclude the County did not impermissibly defer mitigation and decline to consider the two remaining arguments. Finding no merit in petitioners' contentions, we affirm.

2

FACTUAL AND PROCEDURAL BACKGROUND

I

*The Adopted Final Mitigated Negative Declaration*

The hazards and hazardous materials section of the adopted final mitigated negative declaration stated the project would "[i]mpair implementation of or physically interfere with an adopted emergency response plan or emergency evacuation plan" and "[e]xpose people or structures to a significant risk of loss, injury or death involving wildland fires, including where wildlands are adjacent to urbanized areas or where residences are intermixed with wildlands," but such impacts would be less than significant. As to the first impact, the County explained: "It is anticipated that Newtown Road would be closed at the Project site with through traffic detoured to Fort Jim Road during construction. The Fort Jim Road route is 0.6 miles longer than the Newtown Road route, resulting in minimal delays to through traffic. The Old Fort Jim Road detour would be approximately 3 miles in length and would require approximately 6 minutes. Access will be provided and maintained to all residences adjacent to the Project area. The County will prepare a detour plan in conjunction with the engineering plans. Project construction activities would be coordinated with [the El Dorado County Sheriff's Office of Emergency Services (Emergency Services Office)] and [the El Dorado County Fire Protection District (County Fire)] as described in Section 3.5.3 of this document."

Section 3.5.3 provided, in pertinent part: "The contract plans will include a temporary evacuation route located downstream from the Project area . . . . This temporary evacuation route will cross South Fork Weber Creek downstream from the proposed bridge, join the middle portion of the driveway at 4820 Newtown Road, and then tie back into Newtown Road just upstream from the Project area. Installation of this temporary evacuation route will require a temporary construction easement from the owner of 4820 Newtown Road . . . . Prior to construction, the County will consult and coordinate with the [Emergency Services Office] and [County Fire] regarding evacuation

3

of residents near the Project site in case of fire or other emergency. If the County Department of Transportation (DOT), [Emergency Services Office], and County Fire determine that the timing of construction (i.e., starting construction early in the year as opposed to late in the year) and other conditions and factors warrant the construction of the temporary evacuation route, the temporary evacuation route will be constructed in conjunction with the full closure of Newtown Road. If County DOT, [the Emergency Services Office], and County Fire determine that adequate options exist to evacuate and/or shelter in place residents near the Project site in case of a fire or other emergency, and the timing of construction and other conditions and factors do not warrant the construction of the temporary evacuation route, the temporary evacuation route will not be constructed.

"If the temporary evacuation route is constructed, it will only be used in the event of an emergency that warrants an evacuation ordered by [the Emergency Services Office].

"Regardless of whether or not the temporary evacuation route is constructed, any evacuation order or shelter in place order from [the Emergency Services Office] will be executed in whatever manner [the Emergency Services Office] deems appropriate for the emergency that necessitates the evacuation. Since each emergency has its own unique set of circumstances, it is not possible to predetermine the manner (or direction) any specific resident will evacuate or shelter in place during a theoretical emergency. Rather, if an emergency occurs, [the Emergency Services Office] will utilize its best practices to notify the public and direct them to evacuate. Examples of best practices for evacuation notification include reverse 911 calls and door-to-door notifications by Sheriff's deputies."

As to the second impact, the County explained: "The completed Project will not expose people or structures to a new or increased significant risk of loss, injury, or death involving wildland fires. Project construction activities would be coordinated with local

4

law enforcement and emergency services providers as applicable. Project impacts are less than significant and no mitigation is needed."

In master response to comments number 3, the County responded to a letter submitted by attorney Marsha Burch on behalf of Nagel, "assert[ing] that project construction may prevent 'a residential area (including over 100 homes) from having the ability to effectively evacuate during a wildfire.' " The response stated: "First, there are only 47 developed parcels that feed to Newtown Road between the two intersections with Fort Jim Road. This is clearly shown by viewing publicly available mapping websites . . . . There is no factual basis for the assertion that there are 100 homes that might be precluded from evacuating effectively. Second, the County has consulted with both the [Emergency Services Office] and [County Fire] regarding the proposed closure of Newtown Road at the project site. Representatives from both [the Emergency Services Office] and [County] Fire were comfortable with the County's proposal to mitigate the closure of Newtown Road.

"Decisions regarding evacuations are made by the [Emergency Services Office].

"The [mitigated negative declaration] includes a temporary emergency evacuation route just downstream from the new bridge. As shown on pages 13 and 15 of the [mitigated negative declaration], the temporary emergency evacuation route would be constructed across Weber Creek downstream from the proposed bridge, onto parcel 077-431-62 (Ms. Nagel's property), and up Ms. Nagel's driveway to Newtown Road, just east of the project site. As was stated in the [mitigated negative declaration], if [the Emergency Services Office] and the County determines [*sic*] that it is necessary to build the temporary emergency evacuation route, the County will direct its construction contractor to build it. If [the Emergency Services Office] and the County determine that it is not necessary to build the temporary emergency evacuation route, then the County will not direct its construction contractor to build it, thereby minimizing temporary construction impacts to Ms. Nagel's property and saving taxpayers tens of thousands of

5

dollars. The decision whether or not to build the temporary emergency evacuation route will be primarily driven by the timing of construction. If construction starts in April or May, it is less likely that the temporary emergency evacuation route will be needed, since by the time fire season starts, construction will be advanced to a point where emergency evacuation traffic would be able to be sent through the construction site. Conversely, if construction starts later in the year, it is far more likely that the temporary emergency evacuation route will be constructed.

"It is important to note that fires and other emergencies are unpredictable and may require instantaneous changes to any plan for evacuation that is developed before the emergency. The [mitigated negative declaration] did not initially discuss the plans in great detail because it could lead people to believe that they should follow a certain evacuation route when in fact the conditions of the actual emergency dictate a modification to the plan. That said, in order to address the comments raised by Ms. Burch, the County is providing more detail for two scenarios as follows:

"Scenario 1: Temporary Emergency Access Route Is Not Constructed

"The area of primary concern with respect to emergency evacuation is along Newtown Road between the two intersections with Fort Jim Road. Newtown Road will be closed at the project site for several months to allow for construction of the new bridge. This will preclude access to the easterly intersection of Newtown and Fort Jim for evacuation purposes for 47 developed parcels. Therefore, if a fire occurs that necessitates the evacuation of the Newtown Road corridor between the Fort Jim intersections, evacuation will need to occur through the westerly intersection of Newtown and Fort Jim.

"If a fire blocks Newtown Road east of the westerly intersection of Newtown and Fort Jim such that the westerly intersection of Newtown and Fort Jim cannot be used as an evacuation route, [the Emergency Services Office] will use other options to evacuate residents, including but not limited to the following:

6

"1.  If site conditions allow, access through the project site to evacuate to the east.

"2.  Use of an inactive road that connects the driveway at 4550 Newtown Road with the driveway at 3705 Fort Jim Road.  This will allow Newtown Road residents to evacuate to Fort Jim Road with the option to then go to either Pleasant Valley or Placerville.  This road has been inspected by [the Emergency Services Office] and can accommodate ingress for emergency vehicles and egress for evacuees.

"3.  Use of Paso Way to connect to Deer Canyon Road, Pioneer Hill Road, and Newtown Road.

"4.  Use of Green Canyon Court to connect to Deer Canyon Road, Pioneer Hill Road, and Newtown Road.

"5.  Use of Paso Way to connect to Deer Canyon Road, Weber Reservoir Road, and Snows Road (vehicles without trailers only).

"6.  Use of Paso Way to connect to 4701 Paso Court and surrounding area, where [the Emergency Services Office] has determined that there is sufficient clear space to allow for sheltering in place.  Should sheltering in place be required, it will be implemented by [the Emergency Services Office] with support from on-scene firefighting assets adequate to protect all evacuees present.

"Scenario 2:  Temporary Emergency Evacuation Route Is Constructed

"The area of primary concern with respect to emergency evacuation is along Newtown Road between the two intersections with Fort Jim Road.  Newtown Road will be closed at the project site for several months to allow for construction of the new bridge.  However, in this scenario, if fire blocks access to the westerly intersection of Newtown and Fort Jim, the temporary emergency evacuation route will open, allowing evacuation egress through the site to points east and south.  In addition, [the Emergency Services Office] may contemplate use of options 2 through 6 listed under Scenario 1."

## II

### *The Litigation*

Petitioners filed a petition for writ of mandate challenging the County's adoption of the final mitigated negative declaration. In their opening trial brief in support of the petition for writ of mandate, petitioners raised two arguments: (1) respondents abused their discretion by failing to properly assess the no-project alternative; and (2) respondents abused their discretion by failing to adequately address the impact of closing the bridge without committing to construction of an evacuation route in the event of fire. Pertinent to the issues raised in this appeal, as the trial court explained, "Petitioners essentially contend[ed] that there is substantial evidence in the record to support a fair argument that . . . the project will have a significant impact on public safety in that the bridge will be closed without [the] County committing to construction of a sufficient evacuation route in the event of fire while the bridge is being replaced leaving Newtown bridge unavailable for evacuation of homes in the vicinity; and the many alternative evacuation plans set forth in the [mitigated negative declaration] are insufficient to mitigate the impact of the project that area residents will be exposed to the dangers of wildfires without evacuation during the closure of the bridge."

The trial court issued a detailed and extensive tentative ruling finding no merit in petitioners' arguments. The trial court thereafter adopted its tentative ruling, denied the petition for writ of mandate, entered judgment in favor of respondents, and awarded respondents their reasonable costs of suit subject to filing a timely memorandum of costs and the outcome of any timely motion to strike or tax costs.

Petitioners appeal. The trial court's ruling on the issues pertinent to this appeal are set forth in the Discussion that follows.

DISCUSSION[1]

I

*The Fair Argument Test*

A

*Applicable Legal Principles*

" 'With certain limited exceptions, a public agency must prepare an [environmental impact report] whenever substantial evidence supports a fair argument that a proposed project "may have a significant effect on the environment." [Citations.]  " 'Significant effect on the environment' means a substantial, or potentially substantial, adverse change in the environment." ' " (*Pocket Protectors v. City of Sacramento* (2004) 124 Cal.App.4th 903, 927.)  "If there is substantial evidence in the whole record supporting a fair argument that a project may have a significant nonmitigable effect on the environment, the lead agency shall prepare an [environmental impact report], even though it may also be presented with other substantial evidence that

---

[1]      We address only the arguments raised by appropriate headings in the argument portion of petitioners' briefs.  In the procedural history portion of petitioners' opening brief, they note several disagreements with the trial court's ruling and appear to raise arguments as to the merits of the statements made in and procedure of adopting the final mitigated negative declaration.  We do not address those contentions.  "Failure to provide proper headings forfeits issues that may be discussed in the brief but are not clearly identified by a heading." (*Pizarro v. Reynoso* (2017) 10 Cal.App.5th 172, 179.)

Petitioners also for the first time argue in their reply brief that the evacuation options described in master response to comments number 3 were not properly incorporated into the mitigated negative declaration and were not made available for public comment.  As noted herein, the trial court relied upon the evacuation options discussed in master response to comments number 3 in its written ruling, yet petitioners did not raise this argument in the trial court or in its opening brief in this appeal.  We thus do not consider the argument. (*American Indian Model Schools v. Oakland Unified School Dist.* (2014) 227 Cal.App.4th 258, 275 ["We will not ordinarily consider issues raised for the first time in a reply brief"].)

the project will not have a significant effect." (*Ibid*.) " 'Substantial evidence' means 'enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached.' [Citation.] Substantial evidence 'shall include facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts.' [Citation.] 'Argument, speculation, unsubstantiated opinion or narrative, evidence which is clearly erroneous or inaccurate, or evidence of social or economic impacts which do not contribute to or are not caused by physical impacts on the environment does not constitute substantial evidence.' " (*Id.* at pp. 927-928.) " 'Complaints, fears, and suspicions about a project's potential environmental impact likewise do not constitute substantial evidence.' " (*Joshua Tree Downtown Business Alliance v. County of San Bernardino* (2016) 1 Cal.App.5th 677, 690.)

" 'Members of the public may . . . provide opinion evidence where special expertise is not required. [Citations.]' [Citation.] However, '[i]nterpretation of technical or scientific information requires an expert evaluation. Testimony by members of the public on such issues does not qualify as substantial evidence. [Citations.]' [Citation.] '[I]n the absence of a specific factual foundation in the record, dire predictions by nonexperts regarding the consequences of a project do not constitute substantial evidence.' " (*Joshua Tree Downtown Business Alliance v. County of San Bernardino*, *supra*, 1 Cal.App.5th at pp. 690-691.)

"The fair argument standard is a 'low threshold' test for requiring the preparation of an [environmental impact report]. [Citations.] It is a question of law, not fact, whether a fair argument exists, and the courts owe no deference to the lead agency's determination. Review is de novo, *with a preference for resolving doubts in favor of environmental review*." (*Pocket Protectors v. City of Sacramento*, *supra*, 124 Cal.App.4th at p. 928.) "Although our review is de novo and nondeferential, however, we must ' "giv[e] [the lead agency] the benefit of [the] doubt on any legitimate, disputed

10

issues of credibility." ' [Citation.] The lead agency has discretion to determine whether evidence offered by the citizens claiming a fair argument exists meets [the Act's] definition of 'substantial evidence.' " (*Ibid.*)

On appeal, an appellant has the burden to demonstrate by citation to the record the existence of substantial evidence supporting a fair argument of significant environmental impact. (*Joshua Tree Downtown Business Alliance v. County of San Bernardino*, *supra*, 1 Cal.App.5th at p. 688.)

B

*The Trial Court's Ruling*

The trial court's written ruling on the fair argument issue stated: "In support of th[e fair argument test] petitioners cited to the following evidence in the administrative record: correspondence from attorney Marsha Burch on behalf of petitioner Nagel, dated August 3, 2018 [citations]; retired CalFire aerial firefighter James Barnes' letter to the County urging that the project be disapproved [citation]; local resident Lisa Souza's comments at a . . . hearing on the mitigated negative declaration [citation]; comments by local resident Bonnie Robertson at a . . . hearing on the mitigated negative declaration [citation]; and petitioner Nagel's comments at a . . . hearing on the mitigated negative declaration [citation]. Petitioners also cited for the first time in the reply a portion of Rod Souza's statements during the . . . hearing. [Citation.]

"Resident Lisa Souza stated at the hearing: 'My name is Lisa Souza. I live at . . . Newtown Road. I have sent a letter to all of you that included the picture of the fire that happened on the 17th. A pole went down. It was hit, went down on Newtown Road, crossed the road, blocked the road, live wires. The fire started across from our home. We-we would have been able to get out perhaps, but everybody else between us and where the bridge is going to go would be trapped. And the fire department had to go all the way around to that side of where the fire was, and they would not have been able to get through if that road was closed. Now, this is something very, very serious and I'm a

11

little emotional about it but, uh, there are a lot of people that live up there, and we're really worried about the fire situation because of our canyon. So, I would like you to really that [*sic*] put that into your hearts and minds when you're considering this project and how it impacts those of us who live in that canyon.' [Citation.]

"Resident Bonnie Robertson stated at the hearing: 'No clear evaluation [*sic*] route has been determined for access prior to the approval of this project. The county report states that "transportation will consult and coordinate with [the Emergency Services Office] and County Fire." The discussion goes on that "if a route is not determined, that regardless of whether or not the temporary evacuation route is constructed, any evaluation [*sic*] order or shelter in place order from [the Emergency Services Office] will be executed in whatever manner [the Emergency Services Office] deems appropriate." This is an undetermined evacuation route which is not acceptable.' [Citation.]

"Petitioner Nagel stated at the hearing: 'I have 15 years fighting wildfires from the air. I am also a widow of a fallen aerial firefighter. I probably have fought between 500 and 1000 wildland fires. I was initial attack. That meant that my job was to be there when it started as soon as possible and to get resources on it, to stop it while it's small. Therefore, we don't have the conflagration that we see today. I have been at this board meeting several times talking to you about our lack of resources from the air have [*sic*] been cut back to probably about maybe 15% of what they were in the previous 15 to 20 years. Our fires are getting bigger. The conditions are getting worse, and initial attack is something that is primary to the saving of lives and property. This project, among other things that it does, is it put forth a very flawed fire evacuation route. Part of the route when the county says they're going to take care of it is going to construct a secondary bridge across Newtown Road down into my meadow and shuffle people out to the east. Sounds good on paper. In reality, the road is 20 feet above the creek and my meadow. Now, I would like to see the construction of this bridge that is going to support all the scared public as they try to get out in the dark to evacuate this area. I remember when the

12

county okayed the approval of repairing Newtown Road by Hooker Construction. I was here then too asking you to stop doing this in the middle of a fire season.' [Citation.]

"Retired CalFire aerial firefighter James Barnes' letter to the County stated: 'For the last 35 years I have served as an aerial firefighter throughout the western states and North Carolina flying both the large DC-4 and DC-6 airtankers and the Grumman S-2T airtanker for CALFIRE. For several years I was based at the Grass Valley and Columbia Air Attack Bases. I have fought fires throughout all of the foothills of California and I have witnessed the destruction of many communities with the associated loss of life and property. I would like to express my concerns about the proposed road project at Newtown road in the bottom of the canyon just East of Placerville. During a wildfire, evacuation or rescue of Citizens adjacent to this road would be problematic at best and the entrapment of large numbers of residents is likely. The proposed road project would block one of the primary escape routes from the canyon for at least one full fire season and possibly two. The prospect of having many casualties produced by a wildland fire should be all to obvious. ¶ In view of the catastrophes that have resulted from the Paradise fire and the Santa Rosa, Napa fires it would be gross negligence to ignore the danger posed to the Citizens on this deep canyon East of Placerville. Provisions must be made to keep the escape routes open during fire season to protect the lives of Citizens trying to escape a deadly fast-moving firestorm. ¶ I hope you will give this dire situation your most earnest consideration and arrive at a plan that will protect the Citizens and taxpayers of Placerville from the death and destruction that a firestorm will produce.' [Citation.]

"Attorney Marsha Burch stated the following in correspondence on behalf of petitioner Nagel [citation]: 'Another overarching concern in this case is the fact that the [mitigated negative declaration] ignores potentially significant adverse impacts as a result of preventing a residential area (including over 100 homes) from having the ability to effectively evacuate during a wildfire. According to the [mitigated negative declaration],

13

residents may be left without any emergency evacuation route, or one might be created, with the only exit being to the west for at least one full fire season, and like many construction projects, it is entirely possible it could be for two or more seasons. [Citation.]  The [mitigated negative declaration] ignores the fact that in the Project area fires generally move from west to east, and so these residents could be trapped during a wildfire.  The [mitigated negative declaration] also says that any analysis or decisions on this will be made later.  This is no small matter.  The County has not even bothered to consult with the [Emergency Services Office] and [County Fire], but claims it will do so before construction, and that whatever they come up with will be good enough. [Citation.]  This is not mitigation, this is deferral of analysis and it could lead to the tragic deaths of County residents because the County does not want to go through the trouble to determine how this impact can be mitigated (if at all) before approving the Project.  ¶ This is absolutely unacceptable and in blatant violation of [the Act], not to mention an appalling stance for a public agency to take.  It would be nice to have each of the County decision makers answer the question on the record whether this 'we will figure it out later' approach would be acceptable to them if this was their neighborhood.  During the deadly fires that are presently raging across California, killing people in their homes, is it really okay to speculate about this?  To say, maybe these folks can just "shelter in place"? The obvious answer is, no.'  [Citations.]

"Resident Rod Souza stated at the . . . hearing:  '. . . If we had that large wind and blow, which we've had in that canyon since we've been there almost 12 years now, a number of times where it really blows.  If that happened, we would have had another small, obviously not as well populated as-as [*sic*] Paradise.  So that's something I'm very concerned about and would like to make sure that we have the plans of what's going to happen if -- to me, there should be a -- considered in the construction some type of temporary way around that construction site so that you can get through which would

14

help solve that problem, but otherwise you're struck in a box canyon. Those are my concerns. Thank you.' [Citation.]"

The trial court further quoted from the master response to comments number 3 and considered "the statements of John Kahling of the County Department of Transportation [citation] during the . . . hearing. He stated: he spoke with Tim Cordero at County Fire and [Emergency Services Office] professionals wherein it was determined that given the canyon's North facing prominence and working in the very early part of fire season in April through July, they were very comfortable with the idea the temporary evacuation route not being built; if something happens to delay commencement of the project resulting in starting the project in July or August, the temporary evacuation route will be built and operational in case it is needed; specific evacuation alternatives were set forth at the hearing; the [Emergency Services Office] staff went out to the site, walked the evacuation route designated on the Souza property, up to the PG&E easement towards Fort Jim Road and confirmed that fire apparatus can make it up and down that hill; another alternative was to make Newtown passable and if it is not possible to do that and get everyone out to the PG&E easement to Fort Jim Road, there are opportunities to shelter in place on Paso Way with firefighting assets adequate to protect the people there; in response to the comments that were seeking more detail about evacuation the County has provided the list of evacuation routes; and based upon that list, the County's analysis, the County's work with [the Emergency Services Office], and discussions with . . . County Fire there is no factual basis to the comments about evacuation, or they are not credible."

The trial court further noted "Supervisor Frentzen acknowledged at the . . . meeting that the response to public comments 'was very detailed, to the point, and I also see our [Emergency Services Office] staff here, supporting that, [*sic*] plan for evacuation and emergency cases.' "

15

The trial court found: "Residents Lisa Souza's and Rod Souza's comments are merely expressing a concern about the respondent County providing for evacuation of the project area residents in the event of a fire during the closure of the Newtown Road bridge for the project. It is not substantial evidence raising a fair argument that despite setting forth the fire evacuation impact arising from the project's closure of Newtown Road bridge for a period of time during construction and the mitigation by planning for multiple evacuation routes, there remains a significant impact to the safety of the area residents even when considering the statements of Mr. Kahling during the County Board meeting . . . and the evacuation options described in the [mitigated negative declaration] including the ones stated in Master Response Comments Number 3. The comments failed to set forth any facts concerning the many plans for evacuation set forth in detail in the [mitigated negative declaration] that would give rise to a reasonable assumption that despite all these alternative evacuation plans, the impact of closing the bridge remained significant. Complaints, fears, and suspicions about a project's potential environmental impact do not constitute substantial evidence. Mere argument, speculation or unsubstantiated opinion, even expert opinion, is not substantial evidence for a fair argument.

"Resident Bonnie Robertson's comment that no clear emergency evacuation route has been determined prior to the approval of this project was also fully addressed by the mitigation explained in the [mitigated negative declaration's] Master Response to Comments Number 3. The statement is not substantial evidence raising a fair argument that despite setting forth the fire evacuation impact arising from the project's closure of Newtown Road bridge for a period of time during construction and the mitigation by planning for multiple evacuation routes, there remains a significant impact to the safety of the area residents even when considering the statements of Mr. Kahling during the County Board meeting . . . and the evacuation options described in the [mitigated negative declaration], including the ones stated in Master Response to Comments

16

Number 3. The comments failed to set forth any facts concerning the many plans for evacuation set forth in detail in the [mitigated negative declaration] that would give rise to a reasonable assumption that despite all these alternative evacuation plans, the impact of closing the bridge remained significant. . . .

"Petitioner Nagel's comments concerning the lack of resources to attack wildfires from the air is not an environmental impact that [the Act] requires to be mitigated. . . . [¶] In addition, petitioner Nagel's opinion that mitigation by construction of a temporary evacuation route is a very flawed fire evacuation route, because it is unlikely to support all the scared public as they try to get out in the dark to evacuate this area is not an opinion of an expert in construction and ground evacuation routes. Petitioner Nagel has not set forth any facts to establish she is an expert in the construction of ground evacuation routes . . . and her comments amount to mere argument, speculation, and improper opinion that is not substantial evidence supporting a fair argument of a significant environmental impact despite mitigation. Furthermore, her comments did not discuss the many plans for evacuation set forth in the [mitigated negative declaration] and failed to set forth any facts concerning the many plans for evacuation that would give rise to a reasonable assumption that despite all these alternative evacuation plans, the impact of closing the bridge remained significant. . . .

"Attorney Marsha Burch's comments on behalf of petitioner Nagel also lacks facts establishing that petitioner Nagel and attorney Burch are experts in construction and ground evacuation routes, therefore, any opinion as to the sufficiency of the construction of a temporary evacuation route or that there are insufficient evacuation routes amount to mere argument, speculation, and improper opinion that is not substantial evidence supporting a fair argument of a significant environmental impact despite mitigation. . . .

"Attorney Burch's comments that wildfire evaluation routes have not been determined or only one western evacuation route that may not be constructed has been designated prior to the approval of this project was also fully addressed by the mitigation

17

explained in Master Response to Comments Number 3 and the statements of Mr. Kahling . . . . Attorney Burch's comments are not substantial evidence raising a fair argument that despite setting forth the fire evacuation impact by the project's closure of Newtown Road bridge for a period of time during construction and the mitigation by planning for multiple evacuation routes, there remains a significant impact to the safety of the area residents even when considering the statements of Mr. Kahling . . . and the evacuation options described in the [mitigated negative declaration], including the ones stated in Master Response to Comments Number 3. The comments failed to set forth any facts concerning the many plans for evacuation set forth in detail in the [mitigated negative declaration] that would give rise to a reasonable assumption that despite all these alternative evacuation plans, the impact of closing the bridge remained significant. Complaints, fears, and suspicions about a project's potential environmental impact do not constitute substantial evidence. . . .

"Attorney Burch's comment that the County has not even bothered to consult with the [Emergency Services Office] and [County Fire] was addressed in [Kahling's statements during the hearing]. [¶] Attorney Burch's legal opinions that the evacuation routes specified are not mitigation and there is a deferral of analysis are not admissible substantial evidence of a fair argument that there remains a significant environmental impact even with the evacuation routes specified by the County in the [mitigated negative declaration]. [Citation.]

"Retired CalFire aerial firefighter James Barnes' letter to the County states an opinion that during a wildfire, evacuation or rescue of Citizens adjacent to this road would be problematic at best and the entrapment of large numbers of residents is likely; and the proposed road project would block one of the primary escape routes from the canyon for at least one full fire season and possibly two. Mr. Barnes has not set forth any facts to establish he is an expert in ground evacuation routes and, therefore, any opinion as to the sufficiency of the ground evacuation routes amount to mere argument,

18

speculation, and improper opinion that is not substantial evidence supporting a fair argument of a significant environmental impact despite mitigation.  Furthermore, his comments did not discuss the many plans for evacuation set forth in the [mitigated negative declaration] and failed to set forth any facts concerning the many plans for evacuation that would give rise to a reasonable assumption that despite all these alternative evacuation plans, the impact of closing the bridge remained significant. . . .

"In summary, petitioners have not cited substantial evidence in the record that raises a fair argument that this project may have a significant non-mitigated impact on the environment due to failure to provide adequate evacuation routes for project area residents during a wildfire or other emergency during construction of the project."

C

*Petitioners Have Failed To Carry Their Burden Of Showing Substantial Evidence*

*Supports A Fair Argument Of Significant Environmental Impact*

Petitioners assert the public comments and observations by Nagel, Barnes, the Souzas, and Bernard Ross[2] constitute substantial evidence supporting "the fair argument that the project would have potentially significant impacts on resident safety and emergency evacuation."  We disagree that the fair argument standard has been met.

To start, petitioners' framing of the fair argument test is erroneous.  The question is not whether substantial evidence supports a fair argument that the proposed project will have significant impacts *on resident safety and emergency evacuation*.  As explained *ante*, the question is whether the project may have a significant effect *on the environment*. (*South Orange County Wastewater Authority v. City of Dana Point* (2011) 196

---

**2**	In their reply trial brief, petitioners relied on a comment from Ross "stating that closure of Newtown Road would make it difficult for first responders to gain access to the area:  'Law enforcement cannot overcome a poorly designed road.  I have experience in that . . . .' "  The trial court did not address this comment.

19

Cal.App.4th 1604, 1615.) The questions in the sample checklist in appendix G to the Act's guidelines[3] -- including, whether the project would expose people or structures to a significant risk of loss, injury, or death involving wildland fires -- do not extend "the [environmental impact report] requirement to situations where the environment has an effect on a project, instead of the other way around." (*South Orange County Wastewater Authority*, at p. 1616.) The Act further "does not *generally* require an agency to analyze how existing hazards or conditions might impact a project's users or residents," unless the project might exacerbate existing environmental hazards. (*California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 392.) Thus, the question before us is whether the residents' comments upon which petitioners rely (given their burden on appeal) constitute substantial evidence supporting a fair argument that the project may have a significant effect on the environment or may exacerbate existing environmental hazards. We conclude the comments relied upon do not constitute substantial evidence in that regard.

First, petitioners argue the Souzas discussed their past experiences with wildfires in the area and explained that people would be trapped during construction of the project if a fire occurred to the west of their property. The Souzas' statements relate to how existing wildfire hazards might impact residents during the project's construction and do not support a fair argument that *the project* may have a potentially significant effect on the environment or may exacerbate existing environmental hazards, i.e., "effects that arise because the project brings 'development and people into the area affected.' " (*California Building Industry Assn. v. Bay Area Air Quality Management Dist.*, *supra*, 62

---

[3] The guidelines are regulations for the implementation of the Act codified in title 14, section 15000 et seq. of the California Code of Regulations, which have been developed by the Office of Planning and Research and adopted by the Secretary of the Natural Resources Agency. (Pub. Resources Code, § 21083.)

Cal.4th at p. 388.) Petitioners further fail to identify any factual foundation for the Souzas' assertion. " '[I]n the absence of a specific factual foundation in the record, dire predictions by nonexperts regarding the consequences of a project do not constitute substantial evidence.' " (*Joshua Tree Downtown Business Alliance v. County of San Bernardino*, *supra*, 1 Cal.App.5th at p. 691.)

Second, petitioners argue Barnes expressed "concerns about the lack of an emergency evacuation route during Project construction" and said, in his opinion, evacuation would be " 'problematic at best and the entrapment of large numbers of residents is likely' because the Project would 'block one of the primary escape routes' from the Project area." Petitioners fail to identify any factual foundation for Barnes's assertion that a large number of people would likely be trapped during an evacuation given the existence of the evacuation routes and options identified in the record. That assertion is thus mere speculation and does not constitute substantial evidence. Further, petitioners fail to explain how Barnes's comments support a fair argument that the project may have a potentially significant effect on the environment or may exacerbate existing environmental hazards. (*United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 153 [we disregard arguments that fail to disclose the reasoning by which the appellant reached the conclusions he, she, or it asks us to adopt].) Finally, as the trial court correctly noted, Barnes did not set forth any facts to establish that he is an expert in ground evacuation routes. A lay person's opinion based on technical information that requires expertise does not qualify as substantial evidence. (*Joshua Tree Downtown Business Alliance v. County of San Bernardino*, *supra*, 1 Cal.App.5th at pp. 690-691.) Indeed, as the County noted, it had consulted with the Emergency Services Office and County Fire, agencies with expertise in emergencies and evacuation, and the agencies "were comfortable with the County's proposal to mitigate the closure of Newtown Road" through the evacuation routes and options described. While petitioners

21

note that Barnes is a retired aerial firefighter, they identify no evidence in the record establishing he has experience in determining, directing, or effecting evacuation routes.

Third, as to Ross, petitioners assert he commented that he would be a victim when a fire starts because they would be trapped with no way out and "detailed his personal experiences with wildfires in the area, how fast they can move and how slow responses can be." Like the prior comments relied upon, Ross's statements relate to how existing wildfire hazards might impact residents during the project's construction; petitioners do not explain how these comments support a fair argument that the project may have a potentially significant effect on the environment or may exacerbate existing environmental hazards. Further, petitioners fail to identify any factual foundation for Ross's assertion that he would be trapped in the event of a fire and, as such, the statement is mere speculation and does not constitute substantial evidence.

Finally, petitioners rely on Nagel's comments that "fires in the area have historically moved west to east, which prevents evacuation to the west"[4] and "[t]hus, while the Newtown Bridge is under construction, residents would not have an emergency evacuation route." Further, Nagel stated the project "included a 'very flawed [temporary] fire evacuation route' " and "a prior similar project had been constructed during fire season, limiting the emergency routes for local residents." Like the other comments relied upon, Nagel's comments do not amount to substantial evidence under the fair argument test.

Petitioners fail to explain the pertinence of the west-to-east fire movement comment in relation to the evacuation routes and options identified in the record. Further, Nagel's unsubstantiated comment that residents would not have an emergency evacuation route is directly contradicted by the evacuation routes and options identified

---

[4] This comment was actually made by Burch, who represented Nagel.

22

in the record, and petitioners do not explain how the project may have a potentially significant effect on the environment or may exacerbate existing environmental hazards in light of those routes and options. Petitioners also do not identify the factual basis and foundation for Nagel's assertions and fail to explain how Nagel's statement that a prior similar project had been constructed during the fire season and had limited emergency routes for residents is pertinent to the consideration of *this project's* potential environmental impacts. For example, there was no comparison provided between the evacuation routes proposed for the prior project as compared to this project; nor is there any discussion as to how the alleged limited emergency routes in the prior project resulted in a significant impact. Moreover, while petitioners note Nagel is an experienced firefighter, they do not argue that she has experience in determining, directing, or effecting evacuations. Accordingly, Nagel's lay opinion based on technical information that requires expertise does not constitute substantial evidence. (*Joshua Tree Downtown Business Alliance v. County of San Bernardino*, *supra*, 1 Cal.App.5th at pp. 690-691.)

Contrary to petitioners' assertion, the public comments petitioners rely upon are not analogous to the public comments constituting substantial evidence in *Arviv*, *Oro Fino*, and *Protect Niles*. (Citing *Arviv Enterprises, Inc. v. South Valley Area Planning Com.* (2002) 101 Cal.App.4th 1333; *Oro Fino Gold Mining Corp. v. County of El Dorado* (1990) 225 Cal.App.3d 872; *Protect Niles v. City of Fremont* (2018) 25 Cal.App.5th 1129.) In *Arviv*, the public comments related to personal observations of impacts that had actually occurred from similar projects in the past. (*Arviv Enterprises, Inc.*, at pp. 1347-1348.) In *Oro Fino*, numerous residents testified regarding the noise they had experienced during the operation of a similar mineral exploration drilling project and numerous residents provided evidence of their experiences with the increase in traffic and traffic mishaps. (*Oro Fino Gold Mining Corp.*, at pp. 882, 883.) In *Protect Niles*, residents commented as to the aesthetic incompatibility of the project and the traffic

safety hazards that would result from the project due to excessive queueing, a tendency of westbound drivers to exceed the posted speed limit, and limited visibility around a 90-degree curve. (*Protect Niles*, at pp. 1146, 1151.) As to the traffic impacts, the court explained that "[r]esidents' personal observations of traffic conditions where they live and commute may constitute substantial evidence even if they contradict the conclusions of a professional traffic study," especially when, as in that case, "residents cite specific facts that call into question the underlying assumptions of a traffic study." (*Id.* at p. 1152.)

Petitioners assert "[t]he common thread between *Arviv*, *Oro Fino*, and *Protect Niles* is that the subject matters local residents opined on would appear to be the types of impacts were [*sic*] some level of expertise would be necessary." Not so. The common thread of those cases is that lay testimony may constitute substantial evidence when the personal observations and experiences directly relate to and inform on the impact of the project under consideration. In contrast to the public comments in those three cases, here, the comments lacked factual foundation and failed to contradict the conclusions by agencies with expertise in wildfire evacuations with *specific* facts calling into question the underlying assumptions of their opinions as it pertained to the project's potential environmental impacts. While petitioners assert that the residents' "[p]ast experiences with fires indicate that fires to the west of the Project area make using Newtown Road Bridge the *only* viable evacuation route," the comments relied upon do not establish that fact, nor do petitioners cite to the record in support of this assertion. (Italics added.) (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246 [" '[i]f a party fails to support an argument with the necessary citations to the record, . . . the argument [will be] deemed to have been [forfeit]ed' "].)

Finally, petitioners argue that "[t]he County failed to properly reject the public comments as non-credible evidence, because it did not ' ["]first identify that evidence with sufficient particularity["] ' to demonstrate adequate credibility analysis." (Quoting

24

*Consolidated Irrigation Dist. v. City of Selma* (2012) 204 Cal.App.4th 187, 208.)  We do not address this argument in light of our conclusion that petitioners failed to identify substantial evidence to support a fair argument that the project may have a significant impact on the environment or may exacerbate existing environmental hazards.

## II

### *Deferred Mitigation*

### A

### *Applicable Legal Principles*

"Generally, it is improper to defer the formulation of mitigation measures. [Citations.]  However, an exception to this general rule applies when the agency has committed itself to specific performance criteria for evaluating the efficacy of the measures to be implemented in the future, and the future mitigation measures are formulated and operational before the project activity that they regulate begins." (*Center for Biological Diversity v. Department of Conservation, etc.* (2019) 36 Cal.App.5th 210, 239.)  Generally, " ' "[i]mpermissible deferral of mitigation measures occurs when an [environmental impact report] puts off analysis or orders a report without either setting standards or demonstrating how the impact can be mitigated in the manner described in the [environmental impact report]."  [Citation.]'  [Citation.]

" '[W]hen, for practical reasons, mitigation measures cannot be fully formulated at the time of project approval, the lead agency may commit itself to devising them at a later time, provided the measures are required to "*satisfy specific performance criteria articulated at the time of project approval*."  [Citation.]  In other words, "[d]eferral of the specifics of mitigation is permissible where the local entity commits itself to mitigation and lists the alternatives to be considered, analyzed and possibly incorporated in the mitigation plan.  [Citation.]  On the other hand, an agency goes too far when it simply requires a project applicant to obtain a biological report and then comply with any recommendations that may be made in the report.  [Citation.]"  [Citation.]

25

" 'In sum, "it is sufficient to articulate specific performance criteria and make further [project] approvals contingent on finding a way to meet them." [Citation.] Essentially, the rule prohibiting deferred mitigation prohibits loose or open-ended performance criteria. Deferred mitigation measures must ensure that the applicant will be required to find some way to reduce impacts to less than significant levels. If the measures are loose or open-ended, such that they afford the applicant a means of avoiding mitigation during project implementation, it would be unreasonable to conclude that implementing the measures *will* reduce impacts to less than significant levels.' " (*Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 234 Cal.App.4th 214, 240-241.)

B

*The Trial Court's Ruling*

As to the deferred mitigation argument, the trial court's written ruling provided: "Seizing on the language in the [mitigated negative declaration] that if timing of the construction and other conditions and factors do not warrant construction of the temporary evacuation route, it will not be constructed [citation], petitioners contend that this amounts to deferral of mitigation. Petitioners ignore the portion of the [mitigated negative declaration] on that same page that commits the County to contract for the temporary evacuation route and only prior to construction will the final decision to construct it be made in consultation with [the Emergency Services Office] and . . . County Fire and that it will not be built in connection with full closure of Newtown Road only if the timing of construction falls outside the normal fire season and other conditions and factors lead to [*sic*] the County, [the Emergency Services Office], and . . . County Fire to determine adequate options exist to evacuate and/or shelter in place residents near the project site in the event of fire or other emergency. Petitioners also ignore Master Response to Comments Number 3, which addresses comments related to emergency evacuation of residents wherein the County expressly states that the decision of whether

26

to build the temporary evacuation route will be primarily driven by the timing of construction, such as if construction starts in April or May it is less likely that the route will be needed, because by the time fire season starts, construction will be advanced to the point where emergency evacuation traffic would be able to be sent through the construction site and if construction starts later in the year, it is far more likely the temporary evacuation route will be constructed [citation]; that if the temporary evacuation route is not constructed there is no easterly evacuation route, then evacuation will occur through the westerly intersection of Newtown and Fort Jim Roads and if the fire blocks Newtown Road east of that westerly intersection such that it can not [*sic*] be used, there are six other specifically designated routes for evacuation, with one route designed for evacuation and sheltering in place with on-scene firefighting assets adequate to protect all evacuees that [*sic*] are present [citation]; and that if the temporary emergency evacuation route is constructed, the temporary evacuation route will be opened if the fire blocks access to the westerly intersection of Newton [*sic*] and Fort Jim Roads allowing egress through the project site to points east and south with [the Emergency Services Office] contemplating the additional use of the other specified evacuation route options, except for the option to go through the project site at the bridge, because it will be closed [citation]."

After citing the pertinent law, the trial court found: "The record establishes that the respondent County has identified multiple mitigation measures related to evacuation routes, including the possibility of construction of a temporary evacuation route which sets forth as the primary consideration for constructing the temporary evacuation route as whether the closure of the bridge occurs during the fire season, and the County has committed to mitigating the impact of closure of the bridge in relation of [*sic*] fire and emergency evacuations during the project's construction. The record establishes that there is no impermissible deferral of the mitigation measures designed to reduce the impact of the project on the risk of project area residents being exposed to a significant

27

risk of loss, injury or death from wildfires to a less than significant impact by setting forth multiple specific planned routes for evacuation."

C

*The County Did Not Impermissibly Defer Mitigation*

Petitioners assert "[t]he County's assumption that the Project would not have a significant impact, while failing to commit to any mitigation, is improper deferral of mitigation." They argue the "County failed to establish specific performance criteria at the time of approval" because it "refused to commit itself to any course of action" and did not "provide a definitive time table or a specific trigger for construction of the temporary emergency evacuation route." In that regard, petitioners believe *Agoura* is analogous. (Citing *Save Agoura Cornell Knoll v. City of Agoura Hills* (2020) 46 Cal.App.5th 665.)

In the pertinent portion of the *Agoura* decision upon which petitioners rely, the court considered the project's potential impacts to cultural resources. (*Save Agoura Cornell Knoll v. City of Agoura Hills*, *supra*, 46 Cal.App.5th at pp. 686-690.) The City of Agoura Hills did not dispute that the project might have significant impacts on cultural resources and that mitigation was required to reduce the impacts to less than significant. (*Id*. at p. 686.) The city argued, however, that two mitigation measures were sufficient to ensure that an identified prehistoric archaeological site at the project would be avoided and undisturbed because the first measure "mandate[d] that 'the tribal cultural resources w[ould] be preserved in place,' while [the second mitigation measure] require[d] the completion of a data recovery program if 'preservation [became] impossible.' " (*Id.* at p. 687.)

The appellate court disagreed, stating, "[c]ontrary to their contention, . . . neither of these measures [were] designed to ensure avoidance of [the prehistoric archaeological site] as a tribal cultural resource." (*Save Agoura Cornell Knoll v. City of Agoura Hills*, *supra*, 46 Cal.App.5th at p. 687.) The court explained: "[The first mitigation measure] provide[d] for the monitoring of ground-disturbing activities with allowances for work

28

stoppages so that 'appropriate actions' c[ould] be taken for any significant archeological or paleontological resources that [were] discovered at the site. [The second mitigation measure] in turn provide[d] for a . . . data recovery excavation program prior to any project-related ground disturbance '[i]f avoidance of [the prehistoric archaeological site was] not possible.' " (*Ibid*.) The mitigated negative declaration did not, however, set forth any analysis of whether the prehistoric archaeological site could be avoided and did not specify any performance criteria for evaluating the feasibility of avoidance as an alternative to excavation. (*Ibid*.) The city never attempted to define the boundaries of the prehistoric archaeological site and never made a finding that it was impractical or infeasible to do so. (*Ibid*.) "On the other hand, the record contain[ed] substantial evidence to support a fair argument that avoidance of [the prehistoric archaeological site was] not feasible based on the existing project footprint." (*Id*. at p. 688.)

The appellate court explained that the second mitigation measure, which would be implemented if avoidance of the prehistoric archaeological site was infeasible, among other things, "improperly defer[red] mitigation of the project's impacts to the site by delaying formulation of several components of the data recovery plan until some future time. [The second mitigation measure] simply provide[d] a generalized list of measures to be undertaken by a qualified archaeologist and Native American monitor, but it d[id] not set forth any performance standards or guidelines to ensure that th[o]se measures w[ould] be effective. For instance, the program call[ed] for the future 'preparation of a technical report' that 'shall include a mitigation monitoring and reporting plan.' Yet the [mitigated negative declaration] d[id] not explain how the undefined monitoring and reporting plan would mitigate the potentially significant effects on the site's cultural resources, nor d[id] it specify any criteria for evaluating the efficacy of that plan. There [wa]s also no indication in the record that it was impractical or infeasible for the City to articulate specific performance criteria for th[o]se data recovery measures at the time of

29

project approval." (*Save Agoura Cornell Knoll v. City of Agoura Hills*, *supra*, 46 Cal.App.5th at p. 688.)

Petitioners assert that, "[a]s in *Agoura*, the County has offered two *de facto* mitigation measures for the Project's emergency evacuation impacts, namely the two 'scenarios' described in the [mitigated negative declaration], wherein one would be necessary if the other was not feasible or effective." (Fn. omitted.) In petitioners' view, "[l]ike in *Agoura* where the lead agency failed to analyze whether avoidance was feasible, the [mitigated negative declaration] here does not include any analysis of whether the alternative mitigation routes would be effective."

*Agoura* is not analogous. The County explained that decisions regarding evacuations are made by the Emergency Services Office. Master response to comments number 3 states the County had consulted with the Emergency Services Office and County Fire regarding the project and both agencies "were comfortable with the County's proposal to mitigate the closure of Newtown Road." The County further explained it would coordinate with the Emergency Services Office and County Fire prior to construction to ensure adequate evacuation options are in place in the event of a fire or other emergency, "any evacuation order or shelter in place order from [the Emergency Services Office] will be executed in whatever manner [the Emergency Services Office] deems appropriate for the emergency that necessitates the evacuation" and, in that regard, the Emergency Services Office will use "best practices to notify the public and direct them to evacuate." In other words, the agency with the expertise and authority over evacuations approved of the mitigation proposed and would continue to play a key role in determining which mitigation measures to employ in a given emergency. The record also shows that it was impractical and infeasible for the County to articulate which evacuation option would be implemented in a specific emergency. As the County explained, "[s]ince each emergency has its own unique set of circumstances, it is not possible to predetermine the manner (or direction) any specific resident will evacuate or shelter in

30

place during a theoretical emergency" and "fires and other emergencies are unpredictable and may require instantaneous changes to any plan for evacuation that is developed before the emergency." The County's analysis is thus not akin to the city's analysis in *Agoura*.

We also disagree with petitioners' assertion that the County failed to commit itself to a course of action, failed to commit to any mitigation, and did not provide a timetable or trigger for construction of the temporary emergency evacuation route. In addition to the information noted in the foregoing paragraph, the mitigated negative declaration provided that the contract plans will include the construction of the temporary evacuation route and the County will consult with the Emergency Services Office, County Fire, and the County Department of Transportation prior to construction of the project to determine whether the temporary evacuation route should be constructed. In other words, the decision whether to construct the temporary evacuation route will be a coordinated effort. The mitigated negative declaration further provides that the decision whether to construct the temporary emergency evacuation route will be made prior to the project's construction, and the criteria for that decision will include the timing of the construction in relation to the fire season.

This is not a situation where mitigation is based on "loose or open-ended performance criteria" such that the mitigated negative declaration affords the County a means of avoiding mitigation during project implementation. (*Center for Biological Diversity v. Department of Fish & Wildlife*, *supra*, 234 Cal.App.4th at p. 241.) "Deferral of the specifics of mitigation is permissible where the local entity commits itself to mitigation and lists the alternatives to be considered, analyzed and possibly incorporated in the mitigation plan." (*Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1275.) The County need not commit to a particular mitigation measure, as long as it commits to mitigating the impacts of the project. (*California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 621.) The details of exactly how

31

mitigation will be achieved under the identified measures can be deferred pending further review by the agencies responsible for emergency evacuation based on the circumstances presented when construction of the project starts, with the primary consideration for constructing the temporary evacuation route being whether the bridge is closed during the fire season.  (See *ibid*.)  The County thus did not impermissibly defer mitigation of the project's impacts.

III

*We Do Not Consider Petitioners' Argument That The County*

*Deferred Analysis Of Temporary Emergency Evacuation Impacts*

Petitioners claim the County unlawfully failed to analyze and instead deferred the analysis as to the following impacts:  (1) whether the project requires a temporary emergency evacuation route; (2) whether the project would expose people to a significant risk of loss, injury or death involving wildland fires; and (3) whether the project would result in inadequate emergency access.  Petitioners further assert that, "[b]y deferring analysis of these impacts, the County also deferred analysis of whether mitigation is necessary," relying on *Lotus*.  (Citing *Lotus v. Dept. of Transportation* (2014) 223 Cal.App.4th 645.)[5]  Petitioners argue that, like in *Lotus*, the "[t]he strategy of incorporating mitigation measures as part of a project to avoid analysis of the mitigated impacts violates [the Act's] public disclosure mandates."

Respondents counter that petitioners' "failure to identify substantial evidence in the record establishing a fair argument of a significant impact to evacuation routes during Project construction is dispositive of their deferral argument."  Respondents further assert petitioners "are arguing for the first time on appeal that the County mischaracterized the temporary culvert as part of the Project when it is in fact mitigation."

---

**5**     Petitioners further contrast *Lotus* with *Mission Bay Alliance v. Office of Community Investment & Infrastructure* (2016) 6 Cal.App.5th 160.)

32

We agree with respondents on both fronts. "Because the concept of deferral of environmental review does not change the threshold imposed by the fair argument test, there is no need for a separate inquiry. In other words, the idea of deferral is subsumed in the fair argument test, which considers whether a potential environmental impact is speculative or reasonably foreseeable; undertaking a separate inquiry would be redundant." (*County Sanitation Dist. No. 2 v. County of Kern* (2005) 127 Cal.App.4th 1544, 1600.)

Petitioners' *Lotus* argument also presents a new theory not advanced in the trial court. In the trial court, petitioners argued that "respondents abused their discretion in failing to adequately address impacts in the [mitigated negative declaration] and in failing to prepare a full [environmental impact report]." (Capitalization and bolding omitted.) Petitioners' theories in support of this argument were: (1) substantial evidence supports a fair argument that the project may have significant emergency evacuation impacts; and (2) respondents improperly deferred mitigation "of the impact of a fire during construction." The trial court addressed both of petitioners' arguments in its written ruling. Petitioners' argument that respondents incorporated mitigation measures as part of the project was not raised in the trial court. Petitioners' assertion in their reply brief that a heading in their opening trial brief preserved the issue for appeal is unavailing. A heading is not argument based on cogent reasoning with citations to the record and legal authority. Because petitioners assert this new theory for the first time on appeal, we decline to consider it. (See *Hussey-Head v. World Savings & Loan Assn.* (2003) 111 Cal.App.4th 773, 783, fn. 7.) We further note petitioners have made no effort to demonstrate they exhausted their administrative remedies in asserting the theory in the administrative process either. (See *Save Agoura Cornell Knoll v. City of Agoura Hills*, *supra*, 46 Cal.App.5th at pp. 676-677 [exhaustion of administrative remedies requires that the exact issue must have been presented to the administrative agency].)

IV

*We Do Not Consider Petitioners' Argument That The County Deferred Analysis*

*Of Impacts Related To Construction Of The Temporary Evacuation Route*

In approximately one page, petitioners assert the County violated the Act by failing to analyze whether the mitigation measure itself, i.e., the construction of a temporary evacuation route, would create new significant impacts because "[t]he County has floated, but not committed to, the idea of building a temporary emergency evacuation route for use when the Project is under construction." Respondents assert petitioners are barred from asserting this argument on appeal because they failed to raise it in the trial court. Petitioners do not respond to respondents' forfeiture argument in their reply.

Respondents are correct that petitioners did not raise this argument in the trial court. As stated in the preceding section, we thus do not consider the argument on appeal.

DISPOSITION

The judgment is affirmed. Respondents shall recover their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1)-(2).)


　　　　　　　　　　　　　　　　　/s/
　　　　　　　　　　　　　　　　　Robie, Acting P. J.


We concur:


　/s/
Hoch, J.


　/s/
Renner, J.


34